No. 34,482

W. W. LANE, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, *Appellant*.

(98 P. 2d 403)

Opinion filed
January 27, 1940.

*Bruce Hurd, C. J. Putt, Robert M. Clark,* all of Topeka, *W. E. Stanley* and *William C. Hook,* both of Wichita, for the appellant.

*J. Rodney Stone, Bernard Peterson, Ezra Branine, Alden E. Branine, Fred Ice* and *Vernon A. Stroberg,* all of Newton, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action for damages alleged to have been sustained when plaintiff was struck by a switch engine operated by defendant. At the close of the evidence of plaintiff the defendant demurred to it. This demurrer was overruled. At the close of the evidence of defendant and after the court had instructed the jury the plaintiff dismissed the action. The defendant appeals from the order of the trial court overruling its demurrer to the evidence of the plaintiff.

After describing the corporate nature of the defendant the petition alleged that the tracks of defendant ran from east to west across the main business street of Newton, near the intersection of Fourth and Main streets, and that the crossing was composed of a series of ten tracks. A map of the intersection showing these tracks was attached to the petition and was introduced in evidence. The petition then alleged that the defendant had established a bell and signal-light system operated by defendant for the purpose of warning and controlling traffic at the crossing and that this system was in operation at the time in question. The petition then alleged that on October

15, 1937, at 5:45 p. m., plaintiff approached this crossing, walking on the sidewalk from the south, on the west side of Main street; that there was no signal ringing or signal light; that as plaintiff approached the watchman's tower, which is about five feet west of the west sidewalk, the defendant started its bell ringing and displayed its signal lights; that plaintiff stopped on the sidewalk while a train pulled westward across the intersection, either on the north track or on the cross-over track from the north to the second track from the north; that as the last car of the train pulled westward the defendant negligently caused the bell to stop ringing and the signal light to be discontinued. The petition then alleged that plaintiff, relying on the signal of safety and the invitation to cross the intersection, that is, the act of the defendant in causing the signal light to stop burning, proceeded north on the sidewalk across the tracks. The petition further alleged that the defendant negligently operated the signal system, and a switch engine backed into plaintiff and injured him while he was about one-half or two-thirds of the way across the intersection. The petition alleged that the negligence of the defendant was as follows:

"1. In causing said signal bell to stop ringing and said signal light to stop burning while the said train, aforesaid, was on said intersection and when said switch engine was entering upon and crossing said intersection.

"2. By causing said switch engine to enter upon and cross said intersection at a high and unreasonable rate of speed such as to endanger the life and limb of pedestrians traveling thereupon and particularly this plaintiff.

"3. By entering upon said intersection with said switch engine without a signal so to do.

"4. By operating said switch engine without a light or signal at the rear or tender thereof.

"5. By operating said engine on said crossing and intersection without any member of its designated crew riding on the rear of said engine across said intersection, the same being, as this plaintiff verily believes, a violation of the safety rules of said defendant for said crossing and intersection, which said fact is particularly within the knowledge of said defendant.

"6. By failing to maintain a proper lookout from said switch engine for pedestrians on said intersection or crossing."

The petition then alleged that the defendant knew, or should have known, that this plaintiff was on the crossing and in a position of peril, but defendant did not do anything to avoid hitting plaintiff. The plaintiff then set out the injuries he had sustained.

Judgment was asked in the amount of $50,000.

For its answer, defendant pleaded first a general denial. The answer then stated that if the plaintiff suffered any injuries at the

place and time in question when he was struck by an engine any injuries he sustained were not the result of any negligence on the part of the defendant, and the negligence on the part of plaintiff was the proximate cause of the injury. The answer then alleged that the plaintiff, having crossed over seven of the tracks, knew that the danger was to be apprehended and failed to exercise reasonable care for his own safety in proceeding on across the tracks; that the plaintiff, being in a place of safety between the seventh and eighth tracks, over which he knew trains were expected to pass frequently, proceeded on to the eighth track without looking to observe whether any train or engine was then occupying the intersection or in such close proximity that it would be dangerous to attempt to cross the track. The answer further alleged that plaintiff negligently and carelessly moved from a position of safety directly into the path of an engine which had already crossed the paved portion of the street and was in close proximity to the sidewalk where plaintiff was, without looking. That he attempted to proceed across a railroad track after warnings had been given by means of horns, bells, lights or switchman signal that trains were approaching and that it would be thereafter dangerous to cross these tracks without looking.

The reply was a general denial. The ground of defendant's demurrer was that plaintiff's evidence failed to prove a cause of action in favor of the plaintiff and against the defendant.

After the order overruling the demurrer the defendant proceeded to introduce its evidence. At the close of the defendant's evidence the defendant asked for a peremptory instruction directing the jury to render a verdict in its favor. This motion was overruled. The trial court then proceeded to instruct the jury. The trial court then advised counsel for plaintiff to proceed with their arguments to the jury. The counsel for plaintiff announced thereupon, however, that they dismissed the cause without prejudice. It was thereupon dismissed.

The defendant appeals from the order overruling the demurrer to the evidence and from all other rulings and orders of the trial court adverse to the defendant made in the trial of the case prior to the dismissal without prejudice.

The only argument made in this court is that the trial court erred in overruling the demurrer to the evidence of plaintiff.

This will necessitate a careful examination of the evidence offered. We shall consider this with the aid of a plat of the intersection

which was introduced in evidence by defendant, but the accuracy of which is not disputed. This plat is attached to this opinion.

Plaintiff testified that on the day in question he left home about

nineteen or twenty blocks from the intersection about 6 o'clock in the evening; as he walked up towards town the street lights were lighted; that he was on the west side of Main street and it was dark when he reached the crossing; that on the first track there was a string of boxcars about flush with the sidewalk; he crossed past them

after looking to the east and west and then he crossed another track or two; that the traffic signals, that is, the bells and lights and wig-wag signal, operated by the man in the signal tower, were not on. He testified further that after he passed the first string of boxcars he crossed another track or two, where there was another string of box-cars almost flush with the sidewalk extending west; he looked to the east as he crossed in front of them and noticed an engine standing on the track ahead of him, just a short distance west of Main street. He testified it was standing still and there was no bell ringing; that there was a passenger train headed west standing on the first track in front of the station; that the traffic signals were not on, so he walked on across in front of the engine, about which he had just testified, and just as he stepped beyond that there was another en-gine pushing a car toward the sidewalk on two or three tracks ahead of him. He testified this engine was coming from the west towards the crossing on a track near the signal tower; that he did not want to be caught out there on the crossing, so he turned and started to go back; that just as he did this the engine west of him came toward the sidewalk, so he stepped off to the north of it and stopped; that the engine pulled up to the crossing and stopped; that about this time the traffic bell started ringing and the signals came on; that the engine was the one in front of which he had just crossed and he turned to face that locomotive from the north side of it. He testi-fied that when he turned to go back off the crossing this locomotive was headed east and the tender was directly over the sidewalk; that he stood there while that engine was stopped. He testified the other engine pushing the car which was on the track north of him con-tinued on across Main street to the east; that the engine south of him backed up to the west and stopped west of the crossing, while the engine in front of him continued on to the west; that about that time the passenger train started to move to the west; that some one carrying a lantern near this engine, which was then west of the crossing, said: "Look out there, I will be coming back." He testi-fied also that this was the locomotive that had retired to the west on the third track, so he determined to place a sufficient distance between himself and that engine.

He testified that he stepped on to the north and after glancing to the east saw an engine on the east side of Main street; that it was standing there just a short distance east of the crossing; that there was no light on it and the bell was not ringing; and it was standing

still; that this engine was on the first track south of the tower on the west side of Main street; that it was only a short distance from the intersection; that he continued walking until he reached that track; he stopped just south of the third track from the north. The train, about which he had testified, had continued to cross the street and when he stopped and looked at the end of the passenger train he glanced over and noticed that this locomotive was standing there without any lights, without indication whatever it was going to move, and about that moment the train whistled to the west, so he quit looking to the east and looked to the west. He did not see any headlight coming from the west and decided that it was the train going out that was whistling for First street and turned his attention again to the end of the train, which was then past the middle of Main street. About that moment the traffic signals were turned off, the bells stopped ringing and he let his eyes follow the end of the train until it had crossed the sidewalk far enough that he could see that the red lights and the wig-wag signals were off and automobiles were moving from the north onto the crossing. After he saw that the red signals were off he took one or two steps with the intention of getting off the crossing and as his eyes swung on around from the automobiles he saw a black bulk right on him. He could not get out of its way. It was too close and there was no light on it and the next thing he was hit and he was down and something seemed to grab him. There was no switchman on the southwest footboard of the tender of that locomotive. There was no lantern there. The traffic signals were not on when he crossed in front of the first loco-motive. That locomotive was not in motion at the time he passed it. It was on the fifth track from the south. He was on the north of it. He was about halfway between these two tracks when the signal lights came on for the first time. He was just south of that track on the concrete while No. 23 was pulling west. Before he moved from that position the passenger train ahead of him was nearing the crossing from the east. He could see the wig-wag signal before he moved to that position. After that he took two or three steps forward. The rear coach of No. 23 was about in the center of the street when he first noticed that the signal bells had stopped ringing. Before he took a step he saw the traffic start to move and the lights were off. He had used that crossing for ten years. He had depended on the warning signals, and depended on them on this particular evening. It was not less than two minutes nor more than three minutes from the time he first went upon the intersection until

the engine hit him. On cross-examination plaintiff testified about as above with the addition that he testified that there were floodlights at this intersection and they lighted up the intersection so that it was fully illuminated and that he could see clearly both ways. He also testified on cross-examination that he looked at the lights first to see that they were on, but they were off, and then took two or three steps ahead onto the tracks; that if he had stayed in the position in which he then was he would not have been struck; that he moved two steps from the safe position and was struck. From the last time that he saw the switch engine cross the street to the east it was clearly visible and standing still. From the time when he first looked at the northeast toward the intersection and saw the switch engine standing there until the time he took two steps across the track and was struck he did not look to the northeast toward the switch engine. He also testified as follows:

"Q. As a matter of fact, you didn't see the switch engine and didn't look for the switch engine or in that direction from the time you saw it standing still until the instant before you were struck just as you had moved on to the track; isn't that correct? A. I hadn't seen it moving until it was right on me.

"Q. You didn't look, did you, until you moved forward? A. I was looking just at that moment, and the lights were turned off.

"Q. And you started across that track? A. Depending on the signals.

"Q. You started across that track and didn't look from the time you saw the engine standing still on the other side? A. Well, it had been only a moment before.

"Q. Is there any reason why you couldn't have seen the switch engine three-fourths of the way across that intersection if you had looked? A. Before I had time to look—

"Q. I am asking you if there was anything that would have prevented you from seeing the switch engine under those floodlights three-fourths of. the way across the intersection if you had looked? A. I was looking at the train, very likely.

"Q. In other words, you were looking at No. 23 pulling out, were you not? A. And waiting to get a chance to look at those signals.

"Q. Do you know of anything that you can tell this jury that would have prevented you from seeing that switch engine half way across that intersection coming towards you on that track in front of you, if you had looked at that time? (Question repeated by the court reporter.) A. Nothing to prevent me from seeing it; no, sir. I depended upon the signal that told me that it wasn't coming."

He also testified:

"The whole crossing was illuminated by these floodlights. If the rear switch lights on the switch engine was burning it would have attracted my attention. It wasn't burning when it hit me. I know that because I saw the

engine just before it hit me when it was right on me. When I stepped onto that track that was the first time I saw it."

Another witness testified that he was nineteen years old; that as he approached the intersection on the night in question the train was pulling out and the signal lights were working; he waited until the traffic lights stopped and went on south; saw the end of the tender on the switch engine; when it was about ten feet from the sidewalk it did not have a light burning on its advancing end. The switch engine came to a stop with the tender end about three or four feet past the west sidewalk. Another young man corroborated this story.

Another witness testified that he was working in the switchman's tower; the bells and lights are operated by one switch and this switch turns them off and on and the horns are separate from the rest of them; these switches are controlled by hand; he started the bells and lights ringing by kicking the switch and the lights would remain on or off until he either pushed or pulled the button.

The general yardmaster for defendant testified that a rule of the defendant provided in substance that in any yard movement a switchman has to be on the forward end of the moving locomotive whether it is backing up or going ahead; the switchman is supposed to be on the engineer's side.

The foregoing is a summary of the evidence of the plaintiff to which the defendant interposed a demurrer. In cases where the sole question being considered is whether a demurrer to the evidence of plaintiff was correctly overruled, and after it was overruled the defendant put in some evidence, any evidence put in by the defendant which tended to supply any insufficiency in the evidence of plaintiff will be considered by this court on appeal. (See *Hayes v. Reid*, 145 Kan. 51, 64 P. 2d 19, also *City of Garnett v. Dowis*, 144 Kan. 484, 61 Pac. 913.) The defendant concedes this to be the rule and although the appeal is from the order overruling the demurrer, has furnished us with an abstract of the defendant's evidence in order to show that this evidence did not supply any elements of proof necessary to support plaintiff's case.

M. C. Snap testified that he was a civil engineer for defendant; he identified a plat of the intersection; the distance across the tracks here is 120 feet. This testimony is included here because the plat about which he testified has been made a part of this opinion.

The switchman for the defendant testified, in describing the collision, as follows:

"The rear light on the locomotive was burning. It is a big headlight in the center of the tank. I know it was burning because I saw it burning. It threw a beam ahead. The bell was ringing at the time. . . . From the time we started across Main street proceeding westward up until the time of the accident the headlight was burning and the bell was ringing."

This testimony has been included because it tends to establish a practice of the company to have a light on the advancing end of switch engines.

The operator of the signal tower testified that he had five plates in the tower similar to the plates in a home where lights are turned on or off; that on the night in question all the lights and signals were turned on during the entire movement of No. 23 as well as of the switch engine; that the lights were not turned off until after plaintiff had been taken from the engine; that the bells were in operation and were operating and did not cease at any time prior to the accident.

This testimony is included here because it tends to prove that the practice of the defendant was to operate these signals for the benefit of pedestrians who were in danger on account of the operation of switch engines.

Defendant argues that the railroad track was itself a warning of danger; that plaintiff was in a place of safety when he stood between the tracks and watched the train pull out and that it was negligence for him to leave his place of safety and step onto the track, where he was hit, without first looking in both directions. Numerous cases where this court has held this in effect are cited and relied on by defendant.

Plaintiff concedes that the foregoing is the rule in ordinary railway crossing cases where the plaintiff goes upon the tracks without stopping to look or listen. He points out here, however, that in this case the defendant had provided traffic signals by lights, bells and horns operated by hand by a man in the signal tower who had the whole series of tracks under his observation; that the plaintiff was familiar with these signals, as used at this particular crossing, and relied on them on the night in question; that the bells and lights were not on when plaintiff entered upon the series of tracks, but came on while he was proceeding across, simultaneously with the arrival of train No. 23 at the station and the approach of the different switch engines to the street, and were turned off when the train pulled out. There is no dispute, as the testimony of the witnesses for the defendant bears out, but that it was the practice of the operator of the signals in the tower to keep the movement of switch engines or trains

on all the tracks under observation at all times and to turn on all the traffic lights and bells when a switch engine or train approached the street.

In *McClain v. Railway Co.*, 89 Kan. 24, 130 Pac. 646, the deceased had arrived at a place where two railway tracks crossed a city street. Ordinarily there was a gate which prevented people from going upon the tracks when a train was approaching. On this occasion this gate was out of repair and on that account deceased went onto the track, and while he was waiting for the passage of a train on the other track stepped too near it and was struck by part of the engine, and killed. The railway company contended that since deceased went upon the track without looking for a train he was guilty of negligence that would bar recovery as a matter of law. This court held that under such circumstances the question of whether the person who went upon the tracks was guilty of contributory negligence was a question of fact for the jury. This court said:

"Ordinarily if a traveler proceeds across a railroad track without taking the precaution to ascertain if there is a train in dangerous proximity he does so at his peril. The application of this rule is modified to some extent by the circumstance that gates have been erected and watchmen employed at crossings. In such case a traveler is not required to exercise the same vigilance when he approaches a track as he would at crossings not so guarded. The railroad track itself is a warning of danger which a traveler cannot safely ignore, but when it is the custom of a railroad company to provide gates or flagmen and thus give other warnings of danger that a train is about to pass, the absence of such warnings may lead a traveler to believe that he can safely proceed or that there will be time to cross before a train will pass. The fact that gates have been erected and are open when a traveler approaches a crossing will not justify him, of course, in closing his eyes and ears when passing over railroad tracks, but it is a circumstance to be weighed by the jury in determining whether at the time he was using the care that a reasonable and prudent man would and should exercise." (p. 30.)

In *Jacobs v. Railway Co.*, 97 Kan. 247, 154 Pac. 1023, the deceased drove upon a railway crossing where an automatic signal bell was maintained but was not ringing, for some reason, at that time. The jury found that the deceased could have seen the approaching train when he was twenty-five feet from the crossing. The plaintiff contended that the rule in *McClain v. Railway Co.* was in point, and that deceased was not guilty of contributory negligence. This court held, however, that the fact the bell was not ringing did not excuse deceased from his duty under the circumstances to stop and listen for an approaching train before going on the tracks. This court dis-

tinguished that case from *McClain v. Railway Co.* on the ground that the gate in the McClain case was operated by hand, that is, human intelligence guarded the crossing and operated the gate in that case, while in the case the court was considering the signal bells were operated mechanically. In this connection it should be noted that in the instant case the signal lights and bells were operated by hand and by a watchman who had the entire scene under his observation at all times and could observe the movement of all trains and switch engines as they approached the street, and this fact was known to plaintiff and relied on by him.

In *Bollinger v. Railway Co.*, 113 Kan. 124, 213 Pac. 644, a city ordinance required a flagman to be at the intersection of the railway tracks within a city street from 6 o'clock in the morning until 6 o'clock in the evening. After some years the railway company changed the flagman's hours so that he went on duty at 9 o'clock in the morning and remained on duty until 5 o'clock in the evening. Plaintiff's car collided with a train on the tracks of the railway company at about 8:15 in the morning when the flagman was not there. At a point twenty-eight feet from the track she could have seen the on-coming train seventy-three feet away. She had frequently seen the flagman there when there was a train and had passed the crossing at various times in the day when the flagman was not there and there was no train. The railway company contended that the plaintiff was guilty of contributory negligence when she drove upon the tracks without looking. This court held the question was for the jury under all the surrounding facts and circumstances. After a discussion of a number of authorities this court said:

"Taking all the circumstances of the case into consideration, including the fact that plaintiff had some reason to think a train was not coming when she did not see the flagman there, and her duties in relation to the situation, we cannot say as a matter of law that the plaintiff was guilty of contributory negligence which precludes her recovery. . . . (*McClain v. Railway Co.*, 89 Kan. 24, 130 Pac. 646; *Williams v. Railroad Co.*, 89 Kan. 35, 53 Pac. 834; *Weston v. Hines*, 107 Kan. 625, 193 Pac. 340.)" (p. 128.)

In *Polfer v. Chicago, G. W. Rld. Co.*, 130 Kan. 314, the plaintiff approached the intersection of a number of railway tracks with a city street. There was a flagman stationed at the crossing and as the plaintiff drove past the flag-shanty the flagman motioned for him to go on. He did go on. As he drove onto track 7 his truck was hit by a train. Had the plaintiff at the time he crossed track 5 looked

to the right along track 7 there was nothing, except the weather, which was misty, to have prevented him from seeing the on-coming train. The railroad company argued that the plaintiff was guilty of contributory negligence as a matter of law because as he crossed track 5, at a distance of 81 feet from track 7, he failed to look to the right where he could have seen the train on that track 250 feet from the point of the collision. This court reviewed *McClain v. Railway Co.*, supra, and *Bollinger v. Railway Co.*, supra, and held that the question was one for the jury. The court said:

"There is even more reason in this case than in the McClain case to rely on the human-intelligence element, for a flagman stationed at the crossing should be as alert to do his duty as one who is the operator of a gate." (p. 320.)

To the same effect is *Weston v. Hines*, 107 Kan. 625, 193 Pac. 340.

In *Whatley v. Chicago G. W. Rld. Co.*, 123 Kan. 187, 252 Pac. 1096, the plaintiff drove his horse and wagon up to the intersection of five railroad tracks and a city street. There was evidence that as he approached the first track he stopped in obedience to a signal from the flagman; that he waited for about five minutes until an engine and cars, which he had seen, had passed over; that he then received a signal from the flagman to go ahead, and started up in reliance on this signal and was struck by a train on the third track. The defendant contended under these facts the plaintiff was guilty of contributory negligence as a matter of law. This court said:

"While there was much evidence tending to contradict the plaintiff's story, the jury and trial judge must be regarded as having settled in his favor the disputed questions of fact, and if, as he testified, he undertook to cross in obedience to a signal, he obviously was not as a matter of law guilty of negligence in doing so." (p. 188.)

The flagman and operator of the gates in all these cases were acting in much the same capacity as the signal man who operated the bells and lights in the signal tower in this case, with the distinction that the signal man in this case had the whole scene under his observation, and by looking could tell whether there was a train or engine in the intersection and about to cross the street. In all the cases the plaintiff relied on the signal, or the absence of a signal, before going ahead and in all of them this court held that under all the circumstances of each case the fact that the signal was given or relied on made the question of contributory negligence one to be submitted to the jury.

Most of the cases which have been discussed here involve ve-

hicular traffic. However, the case of *McClain v. Railway Co.*, supra, involved a pedestrian. This case has often been cited and approved by this court. We see no difference in principle between the case of a pedestrian and the driver of a vehicle. The question is whether the plaintiff used the care that an ordinarily prudent man would use under the circumstances. We hold that it is a question of fact that should have been submitted to the jury.

The authorities cited and relied on by the defendant have been examined, and it appears that they do not deal with cases where the injured party relied on signals given by the railway company.

Before concluding, we should add that the matters presented herein were clearly appealable. (*Kotwitz v. Gridley Motor Co.*, 148 Kan. 676, 84 P. 2d 903, and citations.)

The judgment of the trial court is affirmed.